Josephine VOLLMAR, Appellant,

v.

BOARD OF JEWISH EDUCATION and
Hartford Accident & Indemnity
Company, Respondents.

No. 44875.

Supreme Court of Missouri.

Division No. 2.

March 12, 1956.

Edw. C. Friedewald, St. Louis, for appellant.

John S. Marsalek, Moser, Marsalek, Carpenter, Cleary & Carter, St. Louis, for respondents.

STORCKMAN, Judge.

This is an appeal from a judgment of the Circuit Court of St. Louis County affirming an award of the Industrial Commission. The award disallowed compensation alleged to be due under the Workmen's Compensation Act on account of the death of the claimant's husband.

Herman J. Vollmar, aged 55, was employed by the respondent Board of Jewish Education as a janitor and maintenance man at its school in St. Louis County. Vollmar, with his wife Josephine, the claimant and appellant herein, and a minor son, Donald Anton, lived at the school, occupying a basement apartment. The incident upon which the claim of accidental injury and death is

based occurred on March 24, 1951, while Vollmar, in the discharge of his duties as an employee, was moving a piano from one room to another at the school. There were no witnesses to the occurrence other than the employee. From his written statement given to an investigator for the insurance carrier, Hartford Accident & Indemnity Company, it appears that the rollers of the piano struck a door sill which "caused the piano to jolt" and Vollmar experienced a pain across the lower part of his back "similar to an electric shock, and same ran down to the toes" of his right foot. He continued with his work of moving the piano over the sill and into the other room a further distance of probably about twenty feet.

For the purpose of the case we may assume that the employee suffered an "accident" within the purview of the statutory meaning of that term. § 287.020(2) RSMo 1949, V.A.M.S. The Industrial Commission's Final Award Denying Compensation, dated September 16, 1953, reads as follows: "We find from all the evidence that the death of Herman J. Vollmar, employee herein, was neither caused, hastened nor accelerated by an accident arising out of and in the course of his employment with the Board of Jewish Education on March 24, 1951, as alleged. We further find that employee's death was the result of natural causes, namely, the rupture of an aneurysm of the aorta. Compensation, therefore, must be and the same is hereby denied. Reversing on Review award dated June 10, 1953." The critical inquiry on this appeal shall be whether the accident on March 24, 1951, produced an injury in the sense of "violence to the physical structure of the body" and whether Vollmar's death on August 2, 1951, was a "death resulting from such violence and its resultant effects." § 287.020(3) and (4).

■ The decision of the referee, reversed on review by the Industrial Commission, awarded compensation in the net amount of $9,103.16. That is the amount in dispute and establishes our jurisdiction. Art. V, § 3, Const. of Mo. 1945, V.A.M.S.

According to Mrs. Vollmar, her husband complained to her immediately after the accident. She testified that prior thereto he had been in good health but never had a well moment from the date of the accident to the time of his death. He couldn't eat and lost weight steadily. After the accident he did very little work and mainly supervised the others, although he continued to draw his salary of $150 per month from the respondent Board. Several days after the accident he had a fullness in the stomach and she gave him an enema and the stool was dark. Enemas were repeated from time to time and the stool was always dark.

Vollmar consulted his family physician, Dr. William A. Fries, on March 27 and at intervals thereafter until May 13, 1951. Dr. Fries testified that his examination disclosed that the muscles of the rear chest wall were very painful showing that the muscles were strained and contused. Treatment consisted of applying liniment and bandages. The condition improved but did not clear up, and Dr. Fries recommended hospitalization.

Between May 15 and June 13 Vollmar made a number of visits to the Out Patient Department of Evangelical Deaconess Hospital. Between June 15 and June 28 he was a patient in the hospital and thereafter was again treated on several occasions in the Out Patient Department, the last visit being July 13. He complained of low back pain, constipation and loss of weight. He developed a "partial right foot drop" and a lumbar disc injury was suspected, but a myelogram showed the spinal canal to be of large size without evidence of block, defect or other abnormality.

Vollmar was readmitted to Deaconess Hospital on July 28 and under that date the hospital record states: "Vomiting of blood and black stools. Started on Wednesday of this week (July 25th) with passage of loose, black stool. Had 6 bowel movements that day all black. No pain. On Thursday had no bowel movement. On Friday vomited twice, once after sight of food brought on nausea, vomiting of dark material more reddish than that passed with

stool. Estimated amount not obtained. Had passage of dark stools that day. Today, had been a little dizzy and pounding of pulse in head. Family went shopping leaving him alone. At 1:30 had weakness so that he had to crawl on the floor to move, vomited dark blood, and "passed out." Admitted E.D.H. this afternoon. Has had no pain with this sequence of events, no previous incident like this.'" The tentative diagnosis was bleeding ulcers or a ruptured esophageal varix and the patient was given blood transfusions. On August 2 he had a massive genito-intestinal hemorrhage and vomited a large amount of fresh blood. He could not be relieved by blood transfusions and died later in the same day.

An autopsy disclosed that Vollmar was afflicted with an aortic aneurysm which had ruptured; it was described as an arteriosclerotic saccular aneurysm of the descending aorta. An aneurysm is the distention of a blood vessel at a weakened place, much as an inflated inner tube balloons out at a weak place. The aneurysm had come into contact with, adhered to and eroded into, the posterior surface of the duodenum at the junction of the second and 'middle third. There was an ulcerated area of the' duodenum at the point of contact. There was also fibrosis and an old hemorrhage at about the terminal portion of the abdominal aorta. Death was caused by a massive intestinal hemorrhage. The death certificate listed the cause of death as "Ruptured Aortic Aneurysm."

The report of the autopsy also states: "There are also marked fibrous adhesions between the aorta and the lumbo-sacral region of the spine." There was medical testimony that an aortic aneurysm may press against the spinal nerves and cause back pains and a foot drop of the kind with which Vollmar was afflicted. According to Vollmar's signed statement he continued at work until about May 1, 1951, when he had to stop on account of the pain in his back. On about June 22, 1951, he contacted the insurance carrier and requested accident report forms. The report of accident was dated June 29, 1951, according to the testimony of the insurance investigator. The insurance carrier paid a total of thirteen and three-sevenths weeks of temporary compensation covering the period from May 1, 1951 to August 2, 1951, inclusive. The final payment was requested by the widow and sent to her on November 23, 1951. The claim for compensation on account of death was filed on June 25, 1952. There is no contention that the payment of this temporary compensation is an admission of liability.

It is not claimed that the alleged accident of March 24 caused the aneurysm. Both appellant and respondent assumed it to be in existence on March 24, 1951. The appellant stated the issue in her brief as follows: "In explanation of the injury it is contended that there was a tear in the structure of an existing aneurysm sac of the lower aorta, which caused this structure to become weakened and thereby resulting in a complete rupture of the aneurysm into the duodenum, causing the death of the employee."

■ The narrow but difficult question is whether the rupture and fatal hemorrhage were caused or accelerated by the accident of March 24, 1951. In determining this issue we must consider all of the evidence, together with all reasonable inferences that can reasonably be drawn from it, in the light most favorable to the findings and award of the Industrial Commission. Thacker v. Massman Construction Co., Mo., 247 S.W.2d 623, 627 [3]; Wamhoff v. Wagner Electric Corp., 354 Mo. 711, 190 S.W.2d 915, 917 [4], 161 A.L.R. 1454.

Dr. Herman Blumenthal, as a medical expert, testified on behalf of the claimant that the pathology disclosed by the autopsy and the other evidence in the case was consistent with there having been a tear and hemorrhage in the structure of the aneurysm as a result of the piano moving incident on March 24, 1951, and that this started a process of deterioration that weakened the structure so as to bring about the final rupture and death on August 2, 1951.

On the other hand, two medical experts offered by respondents took a contrary view. Dr. E. C. Holscher, one of the doctors who

treated Vollmar at the hospital, testified that the aneurysm was due to a diseased condition of the aorta and that death was caused by the natural progression of the aneurysm and not to accident. His opinion was that it would be utterly impossible to trace the final rupture and death back to one incident. According to the history, the piano incident precipitated the symptom of back pain, but it had no effect upon the time of Mr. Vollmar's death. To accelerate or increase the course of an aneurysm an injury would have to be something like a well-aimed punch on the aneurysmal sac or in the abdomen.

Dr. Charles W. Miller, also testifying on behalf of the employer and the insurer, stated that in his opinion it was not medically possible to connect Vollmar's death with the occurrence on March 24, 1951. In this doctor's opinion the pain in his back and down his leg did not result from a tear in the aneurysm, but from pressure of the aneurysm on the posterior nerve roots that form the lumbar plexus. That would be the usual pattern. Pushing the piano would cause his heart to beat more forcibly, and the aneurysm to press against his spine, thereby producing the back pain. It is inconceivable that Vollmar had a hemorrhage in March which continued until his death in August. The pigmented tissue disclosed at the autopsy could indicate that a small hemorrhage had occurred not more than two or three weeks before the death, but not as far back as March 24.

The manner and extent to which this court may review an award of the Industrial Commission in a Workmen's Compensation case is quite well defined. See § 287.490 RSMo 1949, V.A.M.S., Art. V, § 22, Const. of Mo.1945, and Wood v. Wagner Elec. Corp., 355 Mo. 670, 197 S.W.2d 647, 649. While awards may be set aside when clearly contrary to the overwhelming weight of the evidence, the courts may not substitute their judgment for that of the Industrial Commission when the award is supported by competent and substantial evidence upon the whole record. Ossery v. Burger-Baird Engraving Co., Mo., 256 S.W.2d 805, 808; Frazier v. National Bearing Division, Mo., 250 S.W.2d 1008, 1011; Long v. Mississippi Lime Co., Mo.App., 257 S.W.2d 167, 170.

It is needless to recite the evidence in further detail. It sufficiently appears from what we have said that this was an extremely difficult and baffling case from the medical standpoint. The cause of disability and death was not known until revealed by the autopsy. It is not strange in this highly unusual situation that medical experts should differ in their reconstruction of the probable course of events leading up to the rupture and hemorrhage which all agree was the cause of Vollmar's death. Was there an earlier hemorrhage due to the accident on March 24, 1951, and if so can the prior hemorrhage be said to have caused or hastened the fatal hemorrhage, or was the fatal hemorrhage entirely independent and due to natural causes? Essentially that is the question upon which the experts differ and which has been decided by the Commission favorably to the respondents. The appellant asks us to rule that the Commission could not reasonably have made the finding it did upon a consideration of all the evidence before it and to hold that the findings are clearly contrary to the overwhelming weight of the evidence. This we cannot do. The cases cited by appellant do not authorize the result for which she contends under the facts of this case.

The case of Harder v. Thrift Construction Co., Mo.App., 53 S.W.2d 34, 37, cited by appellant, affirmed a Commission award allowing compensation for an employee's death from accident which caused a latent syphilitic condition to become active and ultimately result in insanity and death. On the other hand, Commission orders denying compensation have been upheld where it was claimed that cancerous growths were aggravated and death hastened by accidental injury. See Gantz v. Brown Shoe Co., Mo.App., 90 S.W.2d 168, and Tassi v. A. C. L. Haase & Sons Fish Co., Mo.App., 56 S.W.2d 797. In DeLille v. Holton-Seelye Co., 334 Mo. 464, 66 S.W.2d 834, this court affirmed the Commission's award denying compensation where an employee

died as the result of the rupture of an aneurysm while doing his work as a carpenter. In the DeLille case this court, recognizing that the burden was upon the party claiming compensation to prove that the injury and death resulted from an accident within the statutory meaning of the term, held the Commission's finding to be conclusive.

■ Where the ultimate question upon which the right to compensation depends largely resolves itself into which of two conflicting medical or scientific theories should be accepted, such issue is peculiarly for the determination of the Industrial Commission. Williams v. International Shoe Co., Mo.App., 213 S.W.2d 657, 662; Lewis v. Champ Spring Co., Mo.App., 145 S.W.2d 758, 762.

■ From our consideration of the whole record we conclude that the order of the Commission is supported by competent and substantial evidence and that the judgment should be affirmed. It is so ordered.

All concur.